FILED

2018 FEB 23  PM 3: 10

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

LOKESH S. TANTUWAYA,

        Defendant.

SA CR No. 18- CR 18 00040-DOC

I N D I C T M E N T

[18 U.S.C. §§ 371: Conspiracy; 18 U.S.C. §§ 1341, 1346: Mail Fraud Involving Deprivation of Honest Services; 18 U.S.C. §§ 1343, 1346: Wire Fraud Involving Deprivation of Honest Services; 18 U.S.C. § 1952(a)(3): Use of Interstate Facility in Aid of Unlawful Activity; 42 U.S.C. § 1320a-7b(b)(1)(A): Soliciting and Receiving Illegal Remuneration for Health Care Referrals; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.   Healthsmart Pacific Inc., doing business as Pacific Hospital of Long Beach ("Pacific Hospital"), was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot").  Along with Drobot, Pacific Hospital Owner 2 (unindicted co-conspirator ("UCC") A) owned and/or operated Pacific Hospital from in or around 2005 to in or around October 2010.  James Canedo ("Canedo") was the Chief Financial Officer of Pacific Hospital.  UCC-B was an executive and attorney at Pacific Hospital. UCC-C was an executive and attorney at Pacific Hospital.

2.   Defendant LOKESH S. TANTUWAYA ("defendant TANTUWAYA") was a neurosurgeon with a medical practice in San Diego, California.

3.   Dr. Lokesh S. Tantuwaya, M.D., Inc. was a corporation, owned and controlled by defendant TANTUWAYA, that was located in San Diego, California.

4.   MD Aviation, LLC was a limited liability company, owned and controlled by defendant TANTUWAYA, that was located in San Diego, CA.

5.   Paul Randall ("Randall") was a "marketer" who did business with Pacific Hospital and various other entities and individuals and who facilitated defendant TANTUWAYA's relationship with Pacific Hospital.

6.   Alan Ivar ("Ivar") was a chiropractor who did business with Pacific Hospital and various other entities and individuals and referred his patients to defendant TANTUWAYA for surgeries to be performed at Pacific Hospital.

7.   Sean O'Keefe ("O'Keefe") was an attorney licensed in California, specializing in workers' compensation claims, who did

business with Drobot and referred surgeries to defendant TANTUWAYA to be performed at Pacific Hospital.

8. International Implants LLC ("I2") was a limited liability company, controlled by Drobot and headquartered in Newport Beach, California, that purchased implantable medical devices, hardware, and instrumentation for spinal surgeries ("spinal hardware") from original manufacturers and sold them to hospitals, particularly Pacific Hospital.

9. Pacific Specialty Physician Management, Inc. ("PSPM") was a corporation, owned and controlled by Drobot and others and headquartered in Newport Beach, California, that provided administrative and management services for physicians' offices.

10. UCC-D was the controller at various Drobot-owned and/or - controlled entities, including I2 and PSPM (collectively, "Pacific Hospital and Affiliated Entities"), who communicated with defendant TANTUWAYA about his surgeries performed at Pacific Hospital. UCC-A through UCC-D are collectively referred to as "the UCCs".

California Workers' Compensation System ("CWCS")

11. The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment. Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees. When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim. Claims were submitted

to and paid by insurance carriers either by mail or electronically. The CWCS was governed by various California laws and regulations.

12.    The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, that provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employers without any other coverage.

Health Care Programs

13.    SCIF and other workers' compensation insurance carriers, personal injury insurers, and other public and private plans and contracts, were "health care benefit programs" (as defined in 18 U.S.C. § 24(b)), that affected commerce.

14.    The Federal Employees' Compensation Act ("FECA") provided certain benefits to civilian employees of the United States, including United States Postal Service employees, for medical expenses and wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee. Benefits available to injured employees included rehabilitation, medical, surgical, hospital, pharmaceutical, and supplies for treatment of an injury.  The Department of Labor ("DOL") - Office of Workers' Compensation Programs ("OWCP") was the governmental body responsible for administering the FECA program.  When a federal employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment by mail or electronically to Affiliated Computer Services ("ACS"), located in London, Kentucky, which was contracted with the DOL to handle such claims.  Upon approval of the claim, ACS sent payment by

4

1    mail or electronic funds transfer from the U.S. Treasury in

2    Philadelphia, Pennsylvania to the medical service provider.  The FECA

3    program was a federal health care program ("FHCP"), as defined in 42

4    U.S.C. § 1320a-7b(f).

5         Relevant California Laws Pertaining to Bribery and Kickbacks

6         15.  California law, including the California Business and

7    Professions Code and the California Insurance Code, prohibited the

8    offering, delivering, soliciting, or receiving of anything of value

9    in return for referring a patient for medical services.

10        16.  California Business & Professions Code Section 650

11   prohibited the offer, delivery, receipt, or acceptance by certain

12   licensees -- specifically including physicians -- of any commission

13   or other consideration, whether in the form of money or otherwise, as

14   compensation or inducement for referring patients, clients, or

15   customers to any person.

16        17.  California Insurance Code Section 750(a) prohibited anyone

17   who engaged in the practice of processing, presenting, or negotiating

18   claims -- including claims under policies of insurance -- from

19   offering, delivering, receiving, or accepting any commission or other

20   consideration, whether in the form of money or otherwise, as

21   compensation or inducement to any person for the referral or

22   procurement of clients, cases, patients, or customers.

23        18.  Before January 2013, California law allowed a hospital to

24   bill the cost of spinal hardware separately from the other costs of a

25   surgery, such as the surgeon's services and the hospital facility

26   fee, the reimbursement rates of which were set by a fee schedule.

27   The spinal hardware was considered a "pass-through" cost and billing

28

1  was limited to $250 over what the hospital paid for the spinal
2  hardware.

3      19.  Between January 2010 and August 2012, the California Senate
4  and the Division of Workers' Compensation, an agency within the CWCS
5  system, took several steps designed to modify or eliminate the pass-
6  through.

7      20.  By January 2013, California law was amended to eliminate
8  the separate billing of spinal hardware; subsequently, reimbursement
9  for all costs of a surgery was limited to a fee schedule.

10     21.  Federal law prohibited the offering, delivering,
11 soliciting, or receiving of anything of value in return for referring
12 a patient for medical services paid for by a FHCP.

13     Fiduciary Duties and the Physician-Patient Relationship
14     22.  A "fiduciary" obligation generally existed whenever one
15 person -- a client -- placed special trust and confidence in another
16 -- the fiduciary -- in reliance that the fiduciary would exercise his
17 or her discretion and expertise with the utmost honesty and
18 forthrightness in the interests of the client, such that the client
19 could relax the care and vigilance she or he would ordinarily
20 exercise, and the fiduciary knowingly accepted that special trust and
21 confidence and thereafter undertook to act on behalf of the client
22 based on such reliance.

23     23.  Physicians owed a fiduciary duty to their patients,
24 requiring physicians to act in the best interest of their patients,
25 and not for their own professional, pecuniary, or personal gain.
26 Physicians owed a duty of honest services to their patients for
27 decisions made relating to the medical care of those patients,
28 including the informed choice of whether to undergo surgery and other

6

1  medical procedures, as well as the selection of a provider and

2  facility for such surgeries and procedures.  Patients' right to

3  honest services from physicians included the right not to have

4  physician-fiduciaries solicit or accept bribes and kickbacks

5  connected to the medical care of such patients.

6  B.    OBJECTS OF THE CONSPIRACY

7      24.  Beginning on an unknown date, but no later than in or

8  around January 2010, and continuing through at least in or around May

9  2013, in Orange and Los Angeles Counties, within the Central District

10  of California, and elsewhere, defendant TANTUWAYA, Drobot, Canedo,

11  Randall, Ivar, O'Keefe, the UCCs, and others known and unknown to the

12  Grand Jury at various times, knowingly combined, conspired, and

13  agreed to commit the following offenses against the United States:

14  (i) Honest services mail fraud, in violation of Title 18, United

15  States Code, Sections 1341 and 1346; (ii) Honest services wire fraud,

16  in violation of Title 18, United States Code, Sections 1343 and 1346;

17  (iii) Use of an interstate facility in aid of bribery, in violation

18  of Title 18, United States Code, Section 1952(a); (iv) Monetary

19  transactions in property derived from specified unlawful activity, in

20  violation of Title 18, United States Code, Section 1957; and

21  (v) Payment and receipt of kickbacks in connection with a federal

22  health care program, in violation of Title 42, United States Code,

23  Section 1320a-7b(b)(1) and (2).

24  C.    MANNER AND MEANS OF THE CONSPIRACY

25      25.  The objects of the conspiracy were to be carried out, and

26  were carried out, in the following ways, among others:

27          a.   Drobot, Canedo, the UCCs, and other co-conspirators

28  working with Pacific Hospital and Affiliated Entities would offer to

1  pay and cause the payment of kickbacks to defendant TANTUWAYA and
2  other surgeons (the "Pacific Induced Surgeons"), chiropractors,
3  personal injury attorneys, marketers, and others (collectively, the
4  "Pacific Kickback Recipients") in exchange for patient-related
5  referrals to Pacific Hospital and Affiliated Entities for spinal
6  surgeries, other types of surgeries, magnetic resonance imaging
7  ("MRI"), toxicology, durable medical equipment, and other services
8  (the "Kickback Tainted Surgeries and Services") that would be billed
9  to health care benefit programs or subject to personal injury claims
10  and/or liens.

11      b.   Influenced by the promise of kickbacks, Pacific
12  Kickback Recipients, including defendant TANTUWAYA, would cause
13  patients insured by various health care benefit programs to have
14  Kickback Tainted Surgeries and Services at Pacific Hospital and
15  Affiliated Entities.

16      c.   Pacific Hospital and Affiliated Entities and Pacific
17  Induced Surgeons, including defendant TANTUWAYA, would submit claims,
18  by mail and electronically, to health care benefit programs and
19  personal injury law firms and/or attorneys (collectively, "Potential
20  Claim Payers") for payments related to the Kickback Tainted Surgeries
21  and Services.

22      d.   As Drobot, defendant TANTUWAYA, and other co-
23  conspirators knew and intended, and as was reasonably foreseeable to
24  them, in using the mails, wire communications, and facilities in
25  interstate commerce to: (i) communicate about patient referrals and
26  underlying kickback arrangements, (ii) submit claims to Potential
27  Claim Payers for the Kickback Tainted Surgeries and Services, and
28  (iii) obtain payment from Potential Claim Payers for the Kickback

1  Tainted Surgeries and Services, Drobot, defendant TANTUWAYA, and
2  other co-conspirators would solicit, offer, receive, or pay, and/or
3  cause the solicitation, offering, receipt, and payment of kickbacks
4  that were material to patients and Potential Claim Payers.

5          e.   In soliciting and receiving concealed bribes and
6  kickbacks to induce the referral of patients and corresponding
7  ancillary services to Pacific Hospital and Affiliated Entities,
8  defendant TANTUWAYA and other medical professionals would deprive
9  patients of their right to honest services.

10         f.   Using the mails and other facilities in interstate
11 commerce, Drobot, Canedo, the UCCs, and other co-conspirators would
12 communicate about and pay, and cause the payment of, kickbacks to
13 Pacific Kickback Recipients, including defendant TANTUWAYA, who
14 referred and caused the referral of Kickback Tainted Surgeries and
15 Services to Pacific Hospital and Affiliated Entities.

16         g.   Potential Claim Payers would pay Pacific Hospital and
17 Affiliated Entities and Pacific Induced Surgeons, including defendant
18 TANTUWAYA, for the Kickback Tainted Surgeries and Services by mail
19 and electronically.

20         h.   To conceal and disguise the kickback payments from
21 Potential Claim Payers, patients, and law enforcement, Drobot,
22 Canedo, the UCCs, and other co-conspirators, through Pacific Hospital
23 and Affiliated Entities, would enter into arrangements with Pacific
24 Kickback Recipients, including defendant TANTUWAYA.  In many cases,
25 these arrangements would be reduced to written contracts, including,
26 among others, directorship agreements, option agreements, and lease
27 agreements.

28

i.   The written contracts would not specify that one purpose for the agreements would be to induce Pacific Kickback Recipients to refer Kickback Tainted Surgeries and Services to Pacific Hospital and Affiliated Entities.  Additionally, the value or consideration discussed as part of these arrangements would, in fact, generally not be provided or desired; rather, the compensation would be paid, entirely or in part, depending on the arrangement, to cause Pacific Kickback Recipients to refer Kickback Tainted Surgeries and Services to Pacific Hospital and Affiliated Entities.  Relatedly, the written contracts would generally allow for remuneration to Pacific Kickback Recipients far in excess of any reasonable fair market value assessment of legitimate services or things of value purportedly contracted for -- to the extent calculated without regard to the value of the Kickback Tainted Surgeries and Services.

j.   Defendant TANTUWAYA would receive remuneration in exchange for performing Kickback Tainted Surgeries and Services at Pacific Hospital and Affiliated Entities.  The illegal kickback and bribe payments would be provided to defendant TANTUWAYA under the guise of bogus contracts, including a neurosurgery directorship agreement, an option agreement purportedly to acquire defendant TANTUWAYA's medical practice, and an aircraft lease agreement with MD Aviation, LLC.

k.   Drobot and other co-conspirators would also cause Pacific Kickback Recipients to refer Kickback Tainted Surgeries and Services to Pacific Induced Surgeons, who were obligated to bring such surgeries and services to Pacific Hospital and Affiliated Entities.  For example, based on various interrelated kickback arrangements, Ivar would refer spinal surgeries to defendant

1  TANTUWAYA and others, who would perform such referred surgeries at

2  Pacific Hospital.

3       1.    Drobot, Canedo, the UCCs, and others would maintain,

4  review, and/or communicate about records of the number of Kickback

5  Tainted Surgeries and Services performed at Pacific Hospital and

6  Affiliated Entities due to referrals from defendant TANTUWAYA and

7  other Pacific Kickback Recipients, as well as the amounts owed and

8  paid to defendant TANTUWAYA and other Pacific Kickback Recipients for

9  such referrals.

10  D.   EFFECTS OF THE CONSPIRACY

11       26.   Had Potential Claim Payers and patients known the true

12  facts regarding the payment of kickbacks for the referral of Kickback

13  Tainted Surgeries and Services performed at Pacific Hospital: (i) the

14  Potential Claim Payers would have subjected the claims to additional

15  review, would not have paid the claims, and/or would have paid a

16  lesser amount on the claims; and (ii) patients would have more

17  closely scrutinized a surgery or hospital service recommendation,

18  would have sought second opinions from physicians who did not have a

19  financial conflict of interest, would not have had the surgery or

20  service performed, and/or would have insisted on a different hospital

21  facility.

22       27.   From in or around 2008 to in or around April 2013, Pacific

23  Hospital billed Potential Claim Payers at least approximately $500

24  million in claims for the Kickback Tainted Surgeries and Services.

25  Between in or about Janaury 2010 to in or around April 2013,

26  defendant TANTUWAYA performed and/or referred Kickback Tainted

27  Surgeries and Services comprising at least approximately $38 million

28  of the total amount Pacific Hospital billed to Potential Claim

Payers, and for which Pacific Hospital was paid more than approximately $16 million.  Drobot, Canedo, the UCCs, and other co-conspirators, through Pacific Hospital and Affiliated Entities, paid and caused to be paid to defendant TANTUWAYA at least approximately $3.2 million in connection with his Kickback Tainted Surgeries and Services.

E.   OVERT ACTS

28.   On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant TANTUWAYA, Drobot, Canedo, Randall, Ivar, O'Keefe, the UCCs, and other co-conspirators known and unknown to the Grand Jury, committed, willfully caused others to commit, and aided and abetted the commission of the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:   On an unknown date, Drobot and defendant TANTUWAYA executed a "Neurosurgery Directorship Agreement," effective December 1, 2009, where Drobot purported to pay defendant TANTUWAYA $15,000 per month for advising the hospital on the development of a spine surgery program for patients from outside the Long Beach area.

Overt Act No. 2:   On or about January 26, 2010, Drobot caused Pacific Hospital to make a $15,000 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 3:   On an unknown date, Drobot and defendant TANTUWAYA executed an "Option Agreement Regarding Medical Practice of Lokesh Tantuwaya, M.D.," effective March 1, 2010, where Drobot purported to pay defendant TANTUWAYA $70,000 per month for the option of purchasing his medical practice.

1   Overt Act No. 4:   On or about March 3, 2010, Drobot caused
2   Pacific Hospital to make a $15,000 payment to Lokesh Tantuwaya, M.D.,
3   Inc.

4   Overt Act No. 5:   On an unknown date, defendant Drobot and
5   defendant TANTUWAYA executed an "Option to Acquire Medical Practice"
6   effective April 1, 2010, where Drobot purported to pay defendant
7   TANTUWAYA $60,000 per month for the option of purchasing his medical
8   practice.

9   Overt Act No. 6:   On or about May 11, 2010, Drobot caused PSPM
10  to make a $40,000 payment to Lokesh Tantuwaya, M.D., Inc.

11  Overt Act No. 7:   On an unknown date, defendant Drobot and
12  defendant TANTUWAYA executed an "Option to Acquire Medical Practice
13  First Amendment," effective August 1, 2010, where Drobot purported to
14  pay defendant TANTUWAYA $100,000 per month for the option of
15  purchasing his medical practice.

16  Overt Act No. 8:   On or about August 9, 2010, UCC-D sent an
17  email to UCC-B where UCC-D reported in the email attachment: (i) the
18  types of contracts through which defendant TANTUWAYA and other
19  medical professionals were paid, (ii) the total surgeries defendant
20  TANTUWAYA performed at Pacific Hospital, and (iii) that defendant
21  TANTUWAYA had been paid $210,000 and was owed $75,000 more, and UCC-D
22  "agree[d] with Lokesh that there were more done than [the records]
23  showed."

24  Overt Act No. 9:   On or about August 24, 2010, Drobot caused
25  PSPM to make a $100,000 payment to Lokesh Tantuwaya, M.D., Inc.

26  Overt Act No. 10:   In or around 2010 or 2011, defendant
27  TANTUWAYA, Drobot, and O'Keefe met in San Diego for the purpose of
28  establishing a kickback arrangement where Drobot would pay kickbacks

13

to O'Keefe in exchange for O'Keefe referring surgeries to defendant TANTUWAYA that would be performed at Pacific Hospital.

Overt Act No. 11:   On or about April 4, 2011, Drobot caused PSPM to make a $98,900 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 12:   On or about May 19, 2011, O'Keefe emailed defendant TANTUWAYA, copying Drobot and UCC-B, stating that "by now you should have received 12 to 14 new pts" and noting that he planned to refer at least ten new cases to defendant TANTUWAYA per week.

Overt Act No. 13:   On or about May 19, 2011, O'Keefe emailed defendant TANTUWAYA, copying Drobot, UCC-B, and others, stating that he was referring a patient to defendant TANTUWAYA.

Overt Act No. 14:   On or about May 25, 2011, O'Keefe emailed Drobot, copying UCC-B and others, stating that: (i) he needed information regarding payroll for his employees, "Perla and Eliza," and (ii) he had referred about 30 spine surgery cases to defendant TANTUWAYA and planned to refer dozens more, and suggested that they meet with defendant TANTUWAYA.

Overt Act No. 15:   On or about May 25, 2011, defendant TANTUWAYA performed a lumbar surgery on patient E.S.

Overt Act No. 16:   On or about June 8, 2011, Drobot caused PSPM to make a $100,000 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 17:   On or about June 24, 2011, Drobot caused PSPM to make a $155,000 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 18:   On or about June 29, 2011, defendant TANTUWAYA performed a lumbar surgery on patient E.S.

Overt Act No. 19:   On or about June 30, 2011, Canedo and UCC-B discussed via email tracking defendant TANTUWAYA's surgeries at

Pacific Hospital and UCC-B stated: "I also have done what you did last week with Tantuwaya's cases so we could settle up with him."

Overt Act No. 20: On or about July 18, 2011, UCC-B emailed Drobot and reported: (i) defendant TANTUWAYA performed four surgeries at Pacific Hospital, (ii) two of the surgeries were lumbar fusion surgeries in which I2 implants were used, and that the amount owed for those surgeries was $15,000 each, (iii) that one was a lumbar fusion surgery without I2 implants, for which $7,500 was owed, (iv) that one was a cervical fusion surgery without I2 implants, for which $5,000 was owed, and (v) for which defendant TANTUWAYA was owed a total of $42,500.

Overt Act No. 21: On or about July 20, 2011, defendant TANTUWAYA performed a lumbar surgery on patient W.Q.

Overt Act No. 22: On or about August 24, 2011, defendant TANTUWAYA performed a lumbar surgery on patient W.Q.

Overt Act No. 23: On or about August 24, 2011, Drobot caused PSPM to make a $175,000 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 24: On or about September 14, 2011, defendant TANTUWAYA performed a lumbar surgery on patient E.S.

Overt Act No. 25: On or about September 14, 2011, Drobot caused PSPM to make a $37,500 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 26: On or about September 17, 2011, defendant TANTUWAYA sent an email to Drobot regarding the purchase of a Phenom 100 plane.

Overt Act No. 27: On or about September 27, 2011, Drobot caused PSPM to make a $100,000 payment to Lokesh Tantuwaya, M.D., Inc.

1   <u>Overt Act No. 28:</u>   On or about October 5, 2011, defendant
2   TANTUWAYA performed a lumbar surgery on patient R.S.

3   <u>Overt Act No. 29:</u>   On or about October 13, 2011, Drobot caused
4   PSPM to make a $75,000 payment to Lokesh Tantuwaya, M.D., Inc.

5   <u>Overt Act No. 30:</u>   On or about October 19, 2011, defendant
6   TANTUWAYA performed a lumbar surgery on patient C.R.

7   <u>Overt Act No. 31:</u>   On or about November 2, 2011, UCC-B sent an
8   email to Drobot and stated "we owe Dr. Tantuwaya $178,000, primarily
9   for past surgeries we never paid for.  However, if you match October
10  cases and payments we owe about $3,000.  Obviously, Dr. T is looking
11  for the higher number, but he's not given me his information and
12  calculation yet."

13  <u>Overt Act No. 32:</u>   On or about November 2, 2011, UCC-D emailed
14  UCC-B and stated, "The columns on the left show in total all the
15  fusions done by Dr Tantuwaya.  Of that amount I pulled out the I2
16  surgeries as shown in the right 2 columns."

17  <u>Overt Act No. 33:</u>   As part of the same November 2, 2011 email
18  chain, UCC-D asks UCC-B, "How does it compare to your numbers?"

19  <u>Overt Act No. 34:</u>   As part of the same November 2, 2011 email
20  chain, UCC-B emailed UCC-D and stated, " . . . your numbers are
21  helpful in filling in the January through March timeframe.  The end
22  result is something I have to go over with Mike [Drobot], but, it
23  appears close to Tantuwaya's numbers."

24  <u>Overt Act No. 35:</u>   As part of the email chain referenced in the
25  preceding Overt Act, on or about November 3, 2011, UCC-B emailed UCC-
26  D, copying Drobot, stating, "My total for October, after a loopback
27  at the actual data shows $110,000.  If you take away 2 cervicals that
28  Randall claims, then the total is $100,000.  So, the $102,500 is

fine.  Let's make sure we both record this as full and final payment for October."

Overt Act No. 36:   On or about November 3, 2011, Drobot caused PSPM to make a $102,500 payment to Lokesh Tantuwaya, M.D., Inc.

Overt Act No. 37:   On an unknown date, Drobot and defendant TANTUWAYA executed an "Aircraft Lease Agreement," effective January 1, 2012, where Drobot purported to pay defendant TANTUWAYA $100,000 per month for the ability to use defendant TANTUWAYA's aircraft.

Overt Act No. 38:   On or about January 19, 2012, defendant TANTUWAYA sent an email to Drobot where he stated "I have an issue with some of the patients that Sean [O'Keefe] is claiming to fall under his 'direction' as many of them were referred to me by other sources that he just happened to be the attorney for.  Also I want to talk to Mr. Drobot on a more equitable allocation of resources with regards to [t]his patient population."

Overt Act No. 39:   On or about February 1, 2012, defendant TANTUWAYA performed a lumbar surgery on patient R.T.

Overt Act No. 40:   On or about February 3, 2012, Drobot caused I2 to make a $150,000 payment to MD Aviation, LLC.

Overt Act No. 41:   On or about February 8, 2012, defendant TANTUWAYA performed a lumbar surgery on patient C.M.

Overt Act No. 42:   On or about May 8, 2012, Drobot caused Pacific Hospital to make a $40,000 payment to the Law Offices of Sean E. O'Keefe.

Overt Act No. 43:   On or about May 29, 2012, defendant TANTUWAYA sent an email to Drobot stating, "The remainder of buyin plus half expenses paid thus far comes to $283,345.  Buyin remaining:

1   150k, etc . . . I will work on option agreement outstanding balance
2   next. Sorry for the delay in getting number to you."

3       Overt Act No. 44:   On or about June 13, 2012, defendant
4   TANTUWAYA performed a lumbar surgery on patient L.J.

5       Overt Act No. 45:   On or about June 13, 2012, O'Keefe sent UCC-
6   C an email that included a list of patients that he referred to
7   defendant TANTUWAYA that had surgery at PHLB.

8       Overt Act No. 46:   On or about July 30, 2012, through an
9   exchange of emails, Drobot, defendant TANTUWAYA, and O'Keefe
10  discussed meeting "at [the] usual restaurant."

11      Overt Act No. 47:   On or about August 9, 2012, UCC-C emailed
12  Drobot regarding defendant TANTUWAYA and stated she was "meeting
13  tomorrow to go over everything back to January" and would "up date
14  you next week."

15      Overt Act No. 48:   On or about August 20, 2012, UCC-C emailed
16  UCC-D and said that defendant TANTUWAYA would arrive at the Newport
17  Beach office that afternoon to meet with UCC-D.

18      Overt Act No. 49:   In or around August 2012, UCC-D created a
19  spreadsheet listing the spinal surgeries defendant TANTUWAYA
20  performed at Pacific Hospital from 2010 through 2012, the amounts
21  defendant TANTUWAYA was to be paid for each surgery, the amounts
22  defendant TANTUWAYA had actually been paid, and the amounts owed to
23  defendant TANTUWAYA.

24      Overt Act No. 50:   On or about August 20, 2012, defendant
25  TANTUWAYA met with UCC-D at her office in Newport Beach to review
26  UCC-D's spreadsheet and to reconcile any disagreements over the
27  amount of money owed to defendant TANTUWAYA.

28

1    Overt Act No. 51:   On or about August 22, 2012, UCC-D sent an

2    email to UCC-C regarding defendant TANTUWAYA stating "there were just

3    3 cases that Dr. Tantuwaya thought should be included," and listed

4    three patients who had received lumbar fusion surgeries, as to two of

5    whom "Dr. T said it was an I2 case."

6    Overt Act No. 52:   On or about October 10, 2012, defendant

7    TANTUWAYA performed a lumbar surgery on patient E.D.

8    Overt Act No. 53:   On or about October 17, 2012, defendant

9    TANTUWAYA met with Drobot and O'Keefe at a restaurant in Del Mar,

10   California to discuss their referral and kickback arrangement.

11   Overt Act No. 54:   On or about November 15, 2012, Drobot caused

12   I2 to make a $170,000 payment to MD Aviation, LLC.

13   Overt Act No. 55:   On or about December 6, 2012, Drobot caused

14   I2 to make a $95,000 payment to MD Aviation, LLC.

15   Overt Act No. 56:   On an unknown date, Drobot and defendant

16   TANTUWAYA executed an "Aircraft Lease Agreement MD Aviation LLC First

17   Amendment," effective January 1, 2013, where Drobot purported to pay

18   defendant TANTUWAYA $50,000 per month for the ability to use

19   defendant TANTUWAYA's aircraft.

20   Overt Act No. 57:   On or about January 8, 2013, defendant

21   TANTUWAYA performed a lumbar surgery on patient E.R.

22   Overt Act No. 58:   On or about January 9, 2013, defendant

23   TANTUWAYA performed a lumbar surgery on patient J.H.

24   Overt Act No. 59:   On or about January 23, 2013, defendant

25   TANTUWAYA performed a lumbar surgery on patient M.G.

26   Overt Act No. 60:   On or about January 23, 2013, defendant

27   TANTUWAYA performed a cervical surgery on J.A.

28   Overt Act No. 61:   On or about January 23, 2013, defendant

performed a lumbar surgery on D.V.

Overt Act No. 62:  On or about January 28, 2013, Pacific Hospital submitted a bill to Gallagher Bassett in the amount of $103,595.10 for patient E.R.'s surgery.

Overt Act No. 63:  On or about January 30, 2013, defendant TANTUWAYA performed a lumbar surgery on patient Er. Ru.

Overt Act No. 64:  On or about January 30, 2013, defendant TANTUWAYA performed a cervical surgery on patient D.A.

Overt Act No. 65:  On or about January 30, 2013, defendant TANTUWAYA performed a cervical surgery on patient C.A.

Overt Act No. 66:  On or about January 30, 2013, defendant TANTUWAYA performed a lumbar surgery on patient J.H.

Overt Act No. 67:  In or around February 2013, UCC-D created a handwritten ledger to track surgeries performed and kickback payments made to Pacific Kickback Recipients where she noted that $47,500 was to be paid to defendant TANTUWAYA for performing surgeries.

Overt Act No. 68:  On or about February 11, 2013, Drobot caused Pacific Hospital to submit a bill to Gallagher Bassett in the amount of $120,967 for patient J.H.'s surgery.

Overt Act No. 69:  On or about February 13, 2013, defendant TANTUWAYA submitted a bill to SCIF in the amount of $15,865.76 for patient M.G.'s surgery.

Overt Act No. 70:  On or about February 19, 2013, Drobot caused Pacific Hospital to submit a bill to SCIF in the amount of $139,313.10 for patient M.G.'s surgery.

Overt Act No. 71:  On or about February 19, 2013, Drobot caused Pacific Hospital to submit a bill to ESIS in the amount of $131,408.10 for patient Er. Ru's surgery.

20

1    <u>Overt Act No. 72:</u>   On or about February 19, 2013, Drobot caused
2    Pacific Hospital to submit a bill to Sedgwick in the amount of
3    $122,374.50 for patient D.A.'s surgery.

4    <u>Overt Act No. 73:</u>   On or about February 19, 2013, Drobot caused
5    Pacific Hospital to submit a bill to SCIF in the amount of
6    $113,250.10 for patient C.A.'s surgery.

7    <u>Overt Act No. 74:</u>   On or about February 19, 2013, Drobot caused
8    Pacific Hospital to submit a bill to Gallagher Bassett in the amount
9    of $167,017.00 for patient J.H.'s surgery.

10   <u>Overt Act No. 75:</u>   On or about February 27, 2013, defendant
11   TANTUWAYA performed a spinal surgery on patient G.M. at Pacific
12   Hospital.

13   <u>Overt Act No. 76:</u>   On or about March 5, 2013, Drobot caused I2
14   to make a $47,500 payment to MD Aviation, LLC.

15   <u>Overt Act No. 77:</u>   On or about March 6, 2013, defendant
16   TANTUWAYA performed a spinal surgery on patient L.T. at Pacific
17   Hospital.

18   <u>Overt Act No. 78:</u>   On or about March 20, 2013, defendant
19   TANTUWAYA performed a spinal surgery on patient G.M. at Pacific
20   Hospital.

21   <u>Overt Act No. 79:</u>   On or about March 29, 2013, Drobot caused
22   Pacific Hospital to submit a bill to SCIF in the amount of $130,571
23   for D.V.'s surgery.

24   <u>Overt Act No. 80:</u>   On or about April 3, 2013, defendant
25   TANTUWAYA performed a spinal surgery on patient C.H. at Pacific
26   Hospital.

27

28

1    Overt Act No. 81:   On or about April 3, 2013, defendant
2 TANTUWAYA performed a spinal surgery on patient C.L. at Pacific
3 Hospital.

4    Overt Act No. 82:   On or about April 10, 2013, defendant
5 TANTUWAYA performed a spinal surgery on patient L.T. at Pacific
6 Hospital.

7    Overt Act No. 83:   On or about April 10, 2013, defendant
8 TANTUWAYA performed a spinal surgery on patient K.F. at Pacific
9 Hospital.

10    Overt Act No. 84:   On or about April 24, 2013, defendant
11 TANTUWAYA performed a spinal surgery on patient C.L. at Pacific
12 Hospital.

13    Overt Act No. 85:   On or about May 28, 2013, Drobot caused I2
14 to make a $111,040 payment to MD Aviation, LLC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTS TWO THROUGH EIGHT

[18 U.S.C. §§ 1341, 1346, 2(b)]

29.   Paragraphs 1 through 23 and 25 through 28 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

A.   THE SCHEME TO DEFRAUD

30.   Beginning on an unknown date, but no later than in or about January 2010, and continuing through at least January 2016, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant TANTUWAYA, Drobot, Canedo, Randall, Ivar, O'Keefe, the UCCs, and others known and unknown to the Grand Jury at various times, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying bribes and kickbacks to induce the referral of Kickback Tainted Surgeries and Services to Pacific Hospital.

B.   OPERATION OF THE SCHEME TO DEFRAUD

31.   The fraudulent scheme operated, in substance, as set forth in paragraph 25 of this Indictment.

C.   USE OF THE MAILS

32.   On or about the following dates, within the Central District of California, and elsewhere, defendant TANTUWAYA, Drobot, Canedo, Randall, Ivar, O'Keefe, the UCCs, and other co-schemers, for the purpose of executing the above-described scheme to defraud, willfully caused the following items to be placed in a post office and authorized depository for mail matter to be delivered by the

23

1  Postal Service and private and commercial interstate carrier, as set

2  forth below:

| COUNT | APPROXIMATE DATE | MAILING |
|-------|------------------|---------|
| TWO | 03/21/2013 | Check (#C7-855632) from SCIF, in the amount of $9,325.89, which was authorized for payment in the Central District of California, to "Coastal Neurosurgery & Spine Associates," representing defendant TANTUWAYA's professional fees for the surgery of patient M.G., whose surgery defendant TANTUWAYA performed at Pacific Hospital on or about January 23, 2013. |
| THREE | 03/29/2013 | Check (#0002379432), in the amount of $36,676.89, from Sedgwick to Pacific Hospital for reimbursement of the claim related to the hospital-billing component of patient J.A., whose surgery defendant TANTUWAYA performed at Pacific Hospital on or about January 23, 2013. |
| FOUR | 04/25/2013 | Check (#C7-864820), in the amount of $69,472.51, from SCIF to Pacific Hospital for reimbursement of the claims related to the hospital-billing component of patients D.V. and C.A., whose surgeries defendant TANTUWAYA performed at Pacific Hospital on or about January 23, 2013 and January 30, 2013, respectively. |
| FIVE | 05/16/2013 | Check (#CU-013893), in the amount of $45,128.10, from SCIF to Pacific Hospital for reimbursement of the claim related to the hospital-billing component of patient B.C., whose surgery was performed by defendant TANTUWAYA at Pacific Hospital on or about January 9, 2012. |
| SIX | 06/21/2013 | Check (#C7-882026), in the amount of $8,891.69, from SCIF to Pacific Hospital for reimbursement of the claim related to the hospital-billing component of patient L.J., whose surgery defendant TANTUWAYA performed at Pacific Hospital on or about June 12, 2012. |

| COUNT | APPROXIMATE DATE | MAILING |
|-------|------------------|---------|
| SEVEN | 07/29/2015 | Check (#103089987), in the amount of $48,170.45, from Gallagher Bassett to Pacific Hospital for reimbursement of the claim related to the hospital-billing component of patient E.R., whose surgery was performed by defendant TANTUWAYA at Pacific Hospital on or about January 9, 2013. |
| EIGHT | 01/19/16 | Check (#0124975018), in the amount of $157,959.80, from Gallagher Bassett to Pacific Hospital for reimbursement of the claim related to the hospital-billing component of patient J.H., whose surgery defendant TANTUWAYA performed at Pacific Hospital on or about January 9, 2013 and January 30, 2013. |

COUNTS NINE THROUGH ELEVEN

[18 U.S.C. §§ 1343, 1346]

33.   Paragraphs 1 through 23 and 25 through 28, including all subparagraphs, are re-alleged as if fully set forth herein.

A.   THE SCHEME TO DEFRAUD

34.   Beginning on an unknown date, but no later than in or about January 2010, and continuing through at least January 2016, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant TANTUWAYA, Drobot, Canedo, Randall, Ivar, O'Keefe, the UCCs, and others known and unknown to the Grand Jury at various times, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying bribes and kickbacks to induce the referral of Kickback Tainted Surgeries and Services to Pacific Hospital.

B.   OPERATION OF THE SCHEME TO DEFRAUD

35.   The fraudulent scheme operated, in substance, as set forth in paragraph 25 of this Indictment.

C.   USE OF INTERSTATE WIRES

36.   On or about the following dates, within the Central District of California, and elsewhere, defendant TANTUWAYA, Drobot, Canedo, Randall, Ivar, O'Keefe, the UCCs, and other co-schemers, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of items by means of wire communication in interstate commerce, as set forth below:

//

//

| COUNT | APPROXIMATE DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------------------|------------------------------|
| NINE | 03/15/13 | Interstate wire through US Bank servers in Olathe, Kansas, effectuating a transfer of $47,500 from I2's City National Bank account ending in 3965 in the Central District of California to defendant TANTUWAYA's MD Aviation, LLC US Bank account ending in 6136 in San Diego, California. |
| TEN | 06/03/13 | Interstate wire through US Bank servers in Olathe, Kansas, effectuating a transfer of $11,040.00 from I2's City National Bank account ending in 3965 in the Central District of California to defendant TANTUWAYA's MD Aviation, LLC US Bank account ending in 6136 in San Diego, California. |
| ELEVEN | 07/16/13 | Interstate wire through US Bank servers in Olathe, Kansas, effectuating a transfer of $100,000.00 from I2's City National Bank account ending in 3965 in the Central District of California to defendant TANTUWAYA's MD Aviation, LLC US Bank account ending in 6136 in San Diego, California. |

COUNT TWELVE

[18 U.S.C. §§ 1952(a)(3), 2]

37.   Paragraphs 1 through 23, 25 through 28, 32, and 36, including all subparagraphs, are re-alleged as if fully set forth herein.

38.   On or about March 15, 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant TANTUWAYA used, aided and abetted the use of, and willfully caused the use of, a facility in interstate commerce, namely, the wire communication identified in Count Nine of this Indictment, with the intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely, kickbacks and bribes in violation of California Business & Professions Code Section 650 and California Insurance Code Section 750, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity, in that on or about April 3, 2013, defendant TANTUWAYA performed a spinal surgery on patient C.H. at Pacific Hospital.

COUNT THIRTEEN

[42 U.S.C. § 1320a-7b(b)(1)(A)]

39.   Paragraphs 1 through 23 and 25 through 28, including all subparagraphs, are re-alleged as if fully set forth herein.

40.   On or about May 28, 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant TANTUWAYA, together with others known and unknown to the Grand Jury, knowingly and willfully solicited and received remuneration, directly and indirectly, in cash and in kind, that is, a check payable to MD Aviation, LLC, in the amount of $111,040, in return for referring patients to Pacific Hospital for Kickback Tainted Surgeries and Services, specifically including the referral of patient T.M., who defendant TANTUWAYA performed surgery on at Pacific Hospital on or about May 15, 2013, for which payment was made in whole and in part under a Federal health care program, namely, the FECA program.

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

41.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendant TANTUWAYA that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant TANTUWAYA's conviction under any of Counts One through Thirteen of this Indictment.

42.   Defendant TANTUWAYA shall forfeit to the United States the following property:

a.   all right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts One through Thirteen of this Indictment, including but not limited to (1) $87,462.76 in Account Funds from U.S. Bank Account No. 153457986136; and (2) $953,415.25 in Account Funds from U.S. Bank Account No. 080015750200; and

b.   a sum of money equal to the total value of the property described in subparagraph a.

43.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), defendant TANTUWAYA shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of defendant TANTUWAYA, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to

1   or deposited with a third party; (c) has been placed beyond the

2   jurisdiction of the Court; (d) has been substantially diminished in

3   value; or (e) has been commingled with other property that cannot be

4   divided without difficulty.

5                                          A TRUE BILL

6

7                                          /s/

8                                          Foreperson

9   SANDRA R. BROWN
    Attorney for the United States,
10  Acting Under Authority Conferred
    by 28 U.S.C. § 515
11

12

13

14  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
15  Chief, Criminal Division

16  DENNISE D. WILLETT
    Assistant United States Attorney
17  Chief, Santa Ana Branch Office

18  JOSEPH T. MCNALLY
    Assistant United States Attorney
19  Deputy Chief, Santa Ana Branch
    Office

20  ASHWIN JANAKIRAM
    SCOTT D. TENLEY
21  Assistant United States Attorneys

22

23

24

25

26

27

28